RENDERED: MAY 14, 2015
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2014-SC-000124-MR

NERY J. RUIZ                                    APPELLANT

V.

ON APPEAL FROM CHRISTIAN CIRCUIT COURT
HONORABLE JOHN L. ATKINS, JUDGE
NO. 13-CR-00004

COMMONWEALTH OF KENTUCKY                  APPELLEE

**OPINION OF THE COURT BY JUSTICE VENTERS**

**<u>VACATING AND REMANDING</u>**

Appellant, Nery Ruiz, appeals from a judgment of the Christian Circuit Court convicting him of first-degree sexual abuse and first-degree sodomy. As grounds for relief Appellant contends that (1) flawed jury instructions and a duplicitous indictment violated his right to a unanimous verdict; and (2) the Commonwealth improperly elicited testimony from a police officer which impermissibly bolstered the credibility of the victim.

Because the instructions given in this case denied Appellant his constitutional right to a unanimous verdict, we vacate the judgment and remand for a new trial. Because the bolstering issue may arise upon retrial, we also address that issue on the merits.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant is the stepfather of "Linda,"[1] who was six years old during the relevant time frame of July 1, 2012, to November 25, 2012. During that time, Linda's mother, who is Appellant's wife, was deployed overseas with her Army unit. Linda and her younger sister resided with Appellant, their grandmother, and their fifteen-year old aunt. On November 28, 2012, Linda told her grandmother and aunt that Appellant had, on several occasions, subjected her to various forms of sexual contact. Linda's grandmother and aunt took her to be examined at a nearby Army hospital. At the hospital, they met with police officers Mike Havens and Ben Walden of the Oak Grove (Kentucky) Police Department.

Based upon Linda's allegations, Appellant was indicted on three counts of sexual abuse (KRS 510.110) and three counts of first-degree sodomy (KRS 510.070). At trial, Linda testified that on many occasions within the five-month period, Appellant took her into his bedroom and subjected her to various forms of sexual contact, including anal sodomy, forcing her to perform oral sodomy on him, and forcing her to touch his penis. Officer Havens testified about the demeanor of Linda and her family when he met them at the hospital. Appellant testified at the trial and denied all of the allegations. He suggested that his mother-in-law (Linda's grandmother) disliked him, and for that reason she coached Linda to make the allegations.

---

[1]"Linda" is a pseudonym we use here to protect the anonymity of a child victim/witness.

At the conclusion of the evidence, the trial court submitted instructions to the jury on one count of first-degree sexual abuse for forcing Linda to touch his penis, one count of sodomy for penetrating Linda anally, and one count of sodomy for having Linda perform oral sodomy on him. The jury acquitted Appellant of anal sodomy, but convicted him of the other two crimes. Consistent with the jury's recommendation, Appellant was sentenced to imprisonment for twenty years. This appeal followed.

## II. UNANIMOUS VERDICT/"DUPLICITOUS INDICTMENT" ISSUES

Appellant contends that the jury instructions given in the case deprived him of the constitutional right to the verdict of a unanimous jury, and, further, that both counts of the indictment were "duplicitous" because they each charged a single crime out of numerous indistinguishable allegations, leaving him with "no adequate notice of the charges that he needed to defend himself against." He also contends for the same reason that the jury instructions, which mirrored the charges of the indictment, were duplicitous. Appellant concedes that these issues are not preserved but requests that we undertake review under the manifest injustice standard contained in RCr 10.26.[2]

### A. Unanimous Verdict

The two jury instructions under which Appellant was convicted stated as follows:

---

[2] RCr 10.26 provides that "A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."

**Instruction No. 5 [first-degree sexual abuse]**
You will find the Defendant guilty of First Degree Sexual Abuse under this instruction if and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or between July 1, 2012, and November 25, 2012 and before the finding of the indictment herein, he subjected the victim to sexual contact involving the victim's hand on his penis and the victim touching his penis with her hand;

AND

B. That at the time of such conduct the victim was less than 12 years of age.

**Instruction No. 6 [first-degree sodomy]**
You will find the Defendant guilty of First Degree Sodomy under this instruction if and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or between July 1, 2012, and November 25, 2012 and before the finding of the indictment herein, he engaged in deviate sexual intercourse involving her mouth on his penis.

AND

B. That at the time of such conduct the victim was less than 12 years of age.

Significantly, as the crimes are phrased in these instructions, the jury is not directed to consider a specific, uniquely identifiable event (such as, at a particular place or time, near a notable date, while wearing particular clothing, or while attending a particular birthday or other such event, etc.). Instead, the instructions, without any other particularized distinction, broadly refer to the five month period of July 1, 2012, and November 25, 2012. Such phrasing poses no problem when the evidence itself relates only to a single, unambiguous occurrence; but when the evidence equally suggests the

4

commission of two or more similar crimes, the potential for unanimous verdict problems arise.

Citing to our recent case *Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky. 2013), Appellant contends that his constitutional right to a unanimous verdict was violated because at trial, the victim testified to multiple indistinguishable instances of sexual abuse and multiple indistinguishable instances of sodomy as having occurred during the relevant time period, and so there is no assurance that each of the jurors were focused upon the same occurrence when they cast their respective guilty votes.

"Section 7 of the Kentucky Constitution requires a unanimous verdict." *Wells v. Commonwealth*, 561 S.W.2d 85, 87 (Ky. 1978). A violation of this provision may occur in several ways; however, as relevant here and as we explained in *Johnson*, a general jury verdict based upon a single instruction convicting a criminal defendant of a crime when two or more separate instances of that single crime were presented at trial violates the requirement of a unanimous verdict. 405 S.W.3d at 449. In *Johnson*, the victim suffered two bone fractures at different times, either of which could have supported a conviction of first-degree criminal abuse. The defendant in *Johnson* was convicted of criminal abuse under a single crime instruction. We held that a unanimous verdict violation occurred because it was entirely possible that some jurors voted for a guilty verdict based upon one fracture, while other jurors voted for a guilty verdict upon the other. The clear import of *Johnson* is that a verdict is not unanimous unless all of the jurors based their conviction

5

of the defendant on the same criminal act; and that the instructions and verdict forms must be couched in language that eliminates any ambiguity regarding the jury's consensus.

Here, as Appellant contends, the rule of *Johnson* was violated. As in many cases of child sex abuse, Linda was the only eye-witness to the crimes charged against Appellant. Although his brief is conspicuously deficient in providing precise citations to Linda's testimony, our review of her one hour and forty-one minutes of testimony bears out Appellant's claim.

Linda testified that Appellant fondled her many times, and on multiple occasions forced her to perform oral and anal sex. In its examination of Linda, the Commonwealth did not have her isolate and identify any individual episode of sexual abuse or sodomy that would relate the specific crime to the instructions to be given to the jury. Instead, her testimony described a generalized, nonspecific and undifferentiated continuing course of conduct of sexual misconduct perpetrated by Appellant using descriptions such as: "sometimes he would make me touch his front[3] and would make me suck on it sometimes"; "sometimes I would be watching TV"; "it would normally happen after I got back from school"; "sometimes he would call me to go in there because he was going to do all that stuff to me"; when he had me get under the covers he "would just tell me to suck on his front"; when Appellant would have her suck his front it would be in the bedroom; and that this conduct would occur "two or three times per week."

---

[3] "Front" was the term Linda used as a reference to male and female genitalia.

6

Consequently, the instructions were prepared on these two charges with no distinguishing descriptions that would fairly apprise the jury of exactly which criminal episode it was charged to consider. Without an instruction to channel the jury's deliberation, the jury was left to adjudicate guilt on any or all of the vaguely alleged incidents, resulting in a verdict of doubtful unanimity. We are unable to distinguish what occurred in this case from the situation in *Johnson*. Indeed, the violation here is even more apparent, because as the number of indistinguishable criminal events described in the evidence increases, from two as in *Johnson*, to the non-specific "many" times and "2 or 3 times a week" for a five-month period that we see in this case, the probability that all jurors agreed on the same event substantially declines. Upon application of *Johnson* and cases preceding it, we are constrained to conclude that Appellant's right to a unanimous verdict was violated.

It is worth noting that the Kentucky Penal Code, KRS Chapters 500-534, does not criminalize serial acts of sex abuse or sodomy as a "course of conduct" crime, such that a similar series of indistinguishable criminal acts would be deemed to constitute the commission of a single crime, and could then be prosecuted as such. As suggested by Justice Abramson in her comment below, the General Assembly could enact such a crime; however, until it does, prosecutors must charge and prove sex crimes as specific, individual acts of criminal behavior.

Having concluded that Appellant's conviction is tainted by unpreserved error, we must consider whether the error was palpable under CR 10.26, so as

7

to compel relief despite his failure to bring the error to the attention of the trial court. When confronted with the same question in *Johnson*, we said:

> This Court concludes that this type of error, which violates a defendant's right to a unanimous verdict and also touches on the right to due process, is a fundamental error that is jurisprudentially intolerable. For that reason, the error in this case was palpable and requires reversal of Appellant's criminal-abuse conviction.

*Johnson*, 405 S.W.3d at 457. Accordingly, we must regard the error as jurisprudentially intolerable. We reverse the judgment and remand the matter for a new trial.

### B. Duplicitous Indictment

Appellant contends that the indictment handed down in this case was duplicitous because it combined multiple separate acts of sexual misconduct into a single description. A duplicitous indictment is "the joining in a single count of two or more distinct and separate offenses." *Johnson* at 453 (*quoting United States v. Starks*, 515 F.2d 112, 116 (3d Cir. 1975)). "In other words, a duplicitous count includes in a single count that must be charged in multiple counts." *Id.*

An examination of the indictment in this case discloses that Counts 1-3 are identical as to the three first-degree sexual abuse charges and that Counts 1-4 are identical as to the three first-degree sodomy charges. Thus, it would seem that the indictment is indeed duplicitous and a violation of the parameters as set forth in *Johnson*. *Id.* at 453-455. However, because we have

reversed on other grounds we need not further review this unpreserved issue on the merits.

### III. EVIDENTIARY ISSUES: THE MISNOMER OF "INVESTIGATIVE HEARSAY;" BOLSTERING/VOUCHING; AND OPINION TESTIMONY ON PROBABLE CAUSE

Appellant also cited as error testimony of Officer Havens, which Appellant contends was improper "investigative hearsay," and which, in turn, impermissibly bolstered the allegations and credibility of the victim. He also cites as error Officer Havens' testimony that "there was probable cause to file a report." Because these matters may recur upon retrial, we address them on the merits.

#### A. *Out of court statements to Officer Havens; so-called "investigative hearsay"*

The trial court granted Appellant's pre-trial motion to prevent the Commonwealth from eliciting "investigative hearsay" from any of its witnesses. Despite the order, Appellant complains on appeal that the Commonwealth's first witness was permitted to introduce improper "investigative hearsay." Lest our repetition of the term "investigative hearsay" be misconstrued, we state here without equivocation: there is no such thing in our jurisprudence as "investigative hearsay." There is no special rule of evidence known as "investigative hearsay." The term simply is not a part of the evidentiary lexicon.

Despite our condemnation in *Sanborn v. Commonwealth*, 754 S.W.2d 534, 541 (Ky. 1988) (*overruled on other grounds by Hudson v. Commonwealth,*

202 S.W.3d 17, 22 (Ky. 2006)), of what has been termed the "investigative hearsay" rule, it is still invoked on occasion. Perhaps we have failed in our decisions to vanquish it with sufficient vigor to send the message. We said in *Sanborn*, "Prosecutors should, once and for all, abandon the term 'investigative hearsay' as a misnomer, an oxymoron." We now extend that suggestion to all of the bench and bar.

The use of the term exposes a fundamental misconception about the nature of the evidence it purports to describe; what it purports to describe is far more effectively, and more precisely, explained by the basic definition of hearsay itself and the conventional rules of evidence pertaining to hearsay. The term, "investigative hearsay" creates the false impression that there is a special or unique species of hearsay evidence that abides by its own rules removed from the rigors of ordinary hearsay law. Using this inartful term serves only to muddle the analysis of issue at hand and to distort the language by which hearsay issues must be resolved.

In its most common application, the term "investigative hearsay" is tagged to an out-of-court statement made to, or in the presence of, a police officer, such that it tends to explain subsequent investigative action taken by the police as a result of the statement. *See Gordon v. Commonwealth*, 916 S.W.2d 176, 179 (Ky. 1995); and *Young v. Commonwealth*, 50 S.W.3d 148, 167 (Ky. 2001). We said recently in *McDaniel v. Commonwealth*: "'[I]nvestigative hearsay' is a 'misnomer . . . derived from an attempt to create a hearsay exception permitting law enforcement officers to testify to the results of their

investigations.' This erroneous basis for the admission of hearsay evidence was rejected in a line of cases beginning with *Sanborn* []." 415 S.W.3d 643, 652 (Ky. 2013) (citations omitted).

To be clear, there is no special rule regarding out-of-court statements made to police officers investigating crimes. Nor do we need such a special rule. The conventional rules of evidence and the traditional evidentiary vocabulary are perfectly suited to describe the legal concept at hand. "Hearsay" is "a statement, other than one made by the declarant while testifying at the trial [ ], offered in evidence to prove the truth of the matter asserted." KRE 801(c). "Hearsay is not admissible except as provided by [the Rules of Evidence] or by rules of the Supreme Court of Kentucky." KRE 802. The principal exceptions to the hearsay rule are found in KRE 801A, KRE 803, and KRE 804. There is no exception particularly dealing with statements made to police officers.

An out-of-court statement made to a police officer is judged by the same rules of evidence that govern any out-of-court statement by any out-of-court declarant. If it is relevant and probative *only* to prove the truth of the matter asserted by the out-of-court declarant, then the statement is hearsay, and its admission into evidence is governed by the traditional hearsay rule. And, as any other statement, if the out-of-court statement made to a police officer has relevance and probative value that is *not* dependent upon its truthfulness, and it is *not* offered into evidence as proof of the matter asserted, then by definition the evidence is *not* hearsay.

11

For example, we held in *Daniel v. Commonwealth* that a police officer's testimony that he had been told by a woman that the defendant had raped her, and that, as a result of her statement, he took the woman into protective custody, was inadmissible hearsay because its only relevance was to prove the fact of the rape; that the officer acted upon the statement to protect the woman was not relevant to any issue in the case. 905 S.W.2d 76, 79 (Ky. 1995). Similarly, in *Young v. Commonwealth*, we held that because "[t]he only purpose for introducing the details of [the out-of-court statement to a police officer] would be to prove that Combs's description did not fit Thomas; thus, it would have been offered to prove the truth of Combs's description and, thus, that Thomas was not the killer." 50 S.W.3d 148, 167 (Ky. 2001).

Correspondingly, when the reason that a witness has taken certain actions *is* an issue in the case, an out-of-court statement that tends to explain that action *would not be hearsay* because it is not offered "to prove the truth of the matter asserted." Rather, it is offered to explain the action that was taken and has relevance regardless of whether the statement was true or false. *See Id.* at 167 ("If so, the out-of-court statement is not hearsay, because it is not offered to prove the truth of the matter asserted but to explain why the officer acted as he did."). It matters not whether the witness was a police officer; the same rules applies.

In such circumstances, because the out-of-court statement would not be subject to the hearsay rule, its admissibility would be determined by

12

application of other rules of evidence.[4] So-called "investigative hearsay" is still, fundamentally, hearsay. *Chestnut v. Commonwealth*, 250 S.W.3d 288, 294 (Ky. 2008). There is no special kind of evidence known as "investigative hearsay;" we have no rule of evidence called the "investigative hearsay rule." Use of the term imparts no meaningful information to the analysis that is not otherwise supplied by the word "hearsay."

Of further difficulty in the review of the "hearsay" issue raised by Appellant, is that he does not identify with any specificity a single instance where Officer Havens offered into evidence an out-of-court statement that we can review to determine if it is hearsay. Despite his complaint about unspecified "investigative hearsay," Appellant's larger concern with Havens' testimony seems to be Havens' description of the demeanor of Linda and her family members as he interviewed them about the allegations of rape and sexual abuse. The issue seems to fall more naturally within Appellant's argument that Havens was improperly permitted to bolster the family members' testimony, and we discuss that argument below.

### B. Bolstering

In response to the prosecutor's questioning, Havens testified that he spoke with Linda about "the events that occurred," and based upon this discussion he found probable cause to issue a report. In response to a question regarding the demeanor of Linda, her aunt, and her grandmother at

---

[4] For example, if a proffered out-of-court statement was relevant for reasons unrelated to whether it was true, factors such as those mentioned in KRE 403 may influence the trial court's discretion in admitting or excluding the statement.

the time he met with them to investigate the accusations, Havens said that Linda would not look him in the eye. He also explained that the aunt and grandmother were upset and anxious. He said they "broke down" as they discussed the abuse, and that he, too, at that point, was overcome with emotion.

Appellant complains that the Commonwealth used this demeanor testimony in its closing argument to bolster the credibility of its witnesses. Appellant concedes that "Havens was very careful not to testify as to the actual statements given to him by the witnesses" but "the purpose of his testimony was to indirectly vouch for the credibility of the witnesses that would follow." He complains that in a case without forensic medical evidence to support the charges the prejudicial effect of that testimony is significant.

As a general rule, a competent witness may testify concerning matters of which he has personal knowledge, including events he has personally observed and perceived. KRE 602. *See Marshall v. Commonwealth*, 60 S.W.3d 513, 520 (Ky. 2001) ("[Witness's] testimony as to what she observed during that time was competent testimony, not hearsay."). We further clarified in *Ordway v. Commonwealth* that a witness may describe another person's "conduct, demeanor, and statements [ ] based upon his or her observations to the extent that the testimony is not otherwise excluded by the Rules of Evidence." 391 S.W.3d 762, 777 (Ky. 2013).

In *McKinney v. Commonwealth*, we agreed that characterizations by witnesses of a defendant's demeanor upon learning of the death of his wife and

stepchildren and the destruction of his home, as "non-emotional," "nothing out of the ordinary," and "calm, didn't show any emotion," were relevant because inferences of guilt or innocence could be drawn from such evidence. 60 S.W.3d 499, 503 (Ky. 2001). The same rule would apply to the demeanor of any witness whose demeanor at a specific time was relevant.[5]

In opposition to the general rule, Appellant contends that statements describing the anguish of Linda, her aunt and her grandmother were relevant only to bolster, or vouch for, their testimony. It is well established that a witness may not vouch for the truthfulness of another witness. *Stringer v. Commonwealth*, 956 S.W.2d 883, 888 (Ky. 1997) (citing *Hall v. Commonwealth*, 862 S.W.2d 321, 323 (Ky. 1993)); *Hoff v. Commonwealth*, 394 S.W.3d 368 (Ky. 2011). We are not persuaded that the situation here implicates our rule against improper bolstering.

Havens did not express a view upon the veracity of Linda and her family. He described their demeanor immediately after claims surfaced that another family member had engaged in a disturbing pattern of child sexual abuse. He said the aunt's and the grandmother's "eyes were swollen" because they had been crying; and that they all "broke down." The rule against bolstering or vouching addresses attempts by one witness to express belief in the credence of another witness. *Cf. Bell v. Commonwealth*, 245 S.W.3d 738, 744–45 (Ky.

---

[5] KRE 401: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

15

2008)[6] (a social worker's statement that a child's testimony seemed "spontaneous" and "unrehearsed" constituted implicit improper bolstering, because it was an attempt to opine upon the veracity of the child.). Here, the overwrought demeanor of Linda's aunt and grandmother as described by Haven was not so much of an effort to enhance their credibility—the child's accusation alone, believable or not, would reasonably give rise to anguish and sorrow. Rather, the testimony more clearly suggests an effort to arouse sympathy for Linda and her family, which may pose its own relevancy concerns.

Nevertheless, the witnesses' distress upon hearing of the *allegation* of abuse says nothing about the *truth* of the allegation. In other words, the revelation of the accusation alone, whether true or false and whether believed or doubted, would understandably provoke emotions of distress and sadness, and it bears little, if any, relevance to a fact in controversy. Upon retrial Havens' testimony that Linda's family members were overwrought by the allegations, and that he, too, was emotionally affected by their anguish, should not be admitted.

## C. *Police Report/Probable Cause*

Appellant also complains of Havens' testimony that upon speaking to Linda about her experience, he "found probable cause" to prepare a report so further investigation would ensue. Although ambiguous, Havens' testimony

---

[6] Overruled on other grounds by *Harp v. Commonwealth*, 266 S.W.3d 813 (Ky. 2008).

could be readily understood to mean that he personally believed Linda's account. While it was certainly relevant and admissible for Havens to explain that he filed his report and further investigation followed, his characterization of the process as having "found probable cause" certainly expresses sufficient belief in the truthfulness of the victim to run afoul of the rule against vouching, and more importantly, the officer's belief that "probable cause" existed is absolutely irrelevant. Upon retrial, Officer Havens should not be permitted to testify as to his personal finding of "probable cause."

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Christian Circuit Court is vacated, and the proceeding is remanded for a new trial consistent with this opinion.

All sitting. Minton, C.J., Abramson, and Noble, JJ., concur. Keller, J., dissents. Cunningham, J., dissents by separate opinion in which Barber, J., joins.

ABRAMSON, J., I join the majority but share the dissent's grave concerns about this type of continuing sexual abuse case and reiterate that the General Assembly can address the problem, as have the legislatures in sister states, by adopting a "course of conduct" statute for multiple sex crimes against a minor. *Johnson*, 405 S.W.3d at 456 n.1.

CUNNINGHAM, J., DISSENTING: With an abiding and profound respect for the members of the majority, I must fervently dissent.

17

A bright, articulate and pretty little seven year old girl, we call Linda, testified that for a period of time covering the charge under the indictment, and while she was six years old, her step-father sexually abused her. The step-father was entrusted with her care while her mother was deployed with the military overseas. That step-father is the Appellant.

With the assistance of pictures and anatomical dolls, Linda recalled how at least two or three times a week, Appellant would take her into his bed and sometimes have her commit oral sex upon him, and sometimes make her touch his penis. The multiple acts, occurring weekly over a five month period were always in his bed, at the same house and usually about the same times. There was nothing more distinguishable about these acts than that. No "specific, identifiable event." No "notable date, while wearing particular clothing, or while attending a particular birthday party or other such event . . . ." There was an awful redundancy to the perversion.

Our Supreme Court today is directing the prosecutor and trial judge to do that which is impossible to do—give vivid definition to each individual act.

Justice Scott and I protested the fallacy of this requirement in *Johnson v. Commonwealth*, 405 S.W.3d 439, 461 (Ky. 2013). We wrote in part:

> The most disturbing result of our decision here today is that it will seriously impair the prosecutions and convictions of those charged with the molestation and rape of small children. A defendant is typically charged with one count of rape of a child under 12 years of age. A small four-year-old toddler testifies and, perhaps with the aid of anatomical dolls, describes the criminal acts committed upon him or her. The victim testifies that the act happened more than once—maybe weekly. It will be impossible for the prosecutor to nail down a certain one as identified by date and place in order to comply with the results of our decision here today.

18

Except for the age, this is exactly what we have before us. The ugly old chicken given flight in *Johnson* has come home to roost.

We will never see this case again. It will be impossible for it to be retried under the dictates of the majority.

Counsel for the Appellant did not object to the instructions given in this case. Why should he? Instead of facing scores of charges of sodomy which would have been justified under the evidence, he faced only two with particularized manner of the offense. The majority today punishes both the prosecutor for showing admirable restraint in charging the Appellant, and the trial judge for giving the instruction agreed upon by the Appellant, yet rewards the defense lawyer for allegedly being asleep at the switch.

Just as it did in *Johnson,* we once again encourage the defense bar to blind side trial judges by simply remaining mute while the trial court gives instructions we now hold as "palpable error." Again, as Justice Scott and I lamented in *Johnson:*

> Our trial judges are being ambushed by such decisions as this one when we so lightly deem palpable error when the mistake has not been preserved. We are watering down our palpable error standard with holdings such as this to the point that it behooves the defense lawyer not to object on jury instructions and just allow the trial court to walk—unwarned—onto the unanimity land mine.

*Id.* at 461.

A unanimous jury found that the small child we call Linda was sodomized by her step-father, not once, but numerous times. We are reversing the conviction under such terms as he will now go free. Therein, lies the "manifest injustice" in the majority opinion.

19

I appreciate the suggestion by the Majority—and as emphasized by Justice Abramson's concurrence—that the legislature needs to give their attention to a "course of conduct" crime. If that would appease the majority and change future outcomes such as the one we have in this case, I welcome it. However, I would respectfully submit that we do not need legislative assistance to solve a problem we have ourselves created. Furthermore, since the unanimity issue arises under our own state constitution, any new crime created by our legislature is still going to run afoul of Section 7 of our constitution as it is now interpreted by the majority in this case.

The whole unanimity issue discussed in this opinion exploded upon the appellate scene within the last ten years or so. As noted in the *Johnson* majority, the "federal constitution's requirement of unanimity has been held not to apply to the states." We recognize, however, that under Section 7 of our state constitution, a unanimous decision by the jury has long been required in criminal cases.

Our Section 7 unanimity cases over the first 110 years of our constitution were fairly simple and straightforward. The 1942 *Cannon* decision and the 1951 *Coomer* case dealt with recalcitrant jurors who reported being coerced into a vote, thus undermining the unanimous verdict. Cannon *v. Commonwealth*, 163 S.W.2d 15 (1942); *Coomer v. Commonwealth*, 238 S.W.2d 161 (Ky. 1951). Even the 1978 *Wells* case held that alternative methods of an assault case—intentional or wanton—was not a breach of the unanimity requirement.

I submit that we jumped the tracks in the *Harp* case, as well as in *Miller v. Commonwealth*, 283 S.W.3d 690 (Ky. 2009). We focused on the wrong issue. Harp was charged with numerous counts of the same crime. These went to the jury with identical instructions. The jury found Harp guilty of all counts. While the wording is less than clear in *Harp*, it appears we reversed that case on the unanimity issue. And we have thrown *Harp* into our growing line of unanimity cases.

*Miller* is similar to *Harp*, except for one major difference. Miller was not convicted on all identical instructions, as Harp was. *Miller* was rightly decided, I believe, for the wrong reason. It was not a unanimity problem. I respectfully submit that it was actually an appellate due process problem. Miller was denied his right to appeal because he did not know, from the jury verdict, which crimes he had been convicted.

*Miller* dealt solely with the lack of unanimity of which *crimes* the defendant committed—not *acts*. Out of seven identical instructions for third-degree rape, Miller was convicted on only four. It was impossible to determine for which of the crimes the jury reached unanimous verdicts. But there was no unanimity problem. The jury was unanimous in finding Miller guilty of some crimes, but not others. But which ones?

The critical issue in *Miller* and in many of our so-called "unanimity" issue cases is that the reviewing court cannot be certain which offense or offenses were committed—not whether the jury voted unanimously. So it is not a unanimity issue. It is a review problem.

21

I would respectfully submit that the reason we are just recently wrestling so much at the appellate level with the so called "unanimity question" is because we have mislabeled it. Section 115 of our state constitution states in part: "In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court . . . ." Not knowing for which crime you are convicted deprives one of any effective means to appeal.

The jury instruction on unanimity is simple. "The *verdict of the jury* must be in writing, must be unanimous and must be signed by one of you as FOREPERSON." 1 Cooper, KENTUCKY INSTRUCTIONS TO JURIES (CRIMINAL) § 2.07A (5th ed. 2006) (emphasis added). The jury is commanded only to reach a unanimous decision on the *verdict*.

There is no Section 115 review problem in this case.

Therefore, I strongly dissent.

Barber, J., joins.

COUNSEL FOR APPELLANT:

Allison E. Coffeen

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Taylor Allen Payne
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General

Rosa Ramsey Groves